WILLIAM H. McKAIG and wife

*v.*

CHARLES P. McKAIG et al.

1. Under the second section of the Dower act (*Rev. 1876 p. 320*) the widow is not entitled to hold without paying rent, until her dower is assigned, a farm without any buildings upon it, belonging to her husband and adjoining and used by him in connection with a farm belonging to the wife, upon which latter were the mansion house occupied by the husband and wife before and at his death.

2. Upon a bill filed by one tenant in common against his co-tenants for partition, containing a charge that one of the defendants has enjoyed and received the rents and profits of the land, and praying that he may be decreed to account for them, the other defendants and co-tenants are entitled to the benefit of an adjudication in complainant's favor on the prayer for an account, without considering or asserting their rights by cross-bill.

On bill for partition. Heard on the pleadings and proofs in open court.

*Mr. Charles E. Hendrickson*, for the complainants.

*Mr. John B. Huffman*, for the defendants.

PITNEY, V. C.

The bill is by a brother against brothers and sisters, asking for partition of land which descended to them from their father, George McKaig, deceased.

There is no dispute as to the shares in which the land is held,

and it clearly appeared at the hearing that it could not be divided without great prejudice, and so there must be a sale.

The bill alleges that Charles P. McKaig, one of the defendants, had been in the exclusive possession and had enjoyed the rents and profits of the premises from the death of the father, which occurred in February, 1879, up to the spring of 1888, a period of nine years, and had during that time cut and carried away therefrom, for his own use, a quantity of wood and timber; that such possession by Charles was had by virtue of an agreement or understanding with the other heirs that he should pay an annual rent of $150 therefor, and that the widow of George McKaig was entitled, as dowress, to one-third of the rents and profits; and it prays that an account may be taken of such rents and profits, and Charles be decreed to pay two-thirds of the same, or that the same may be deducted from his share of the proceeds of the sale of the land.

Charles McKaig only has answered, and he denies that he occupied the premises under any agreement or understanding with his brothers and sisters, but alleges, in substance, that he entered and kept possession as the tenant of the widow, who was entitled to such possession and to the rents and profits until her dower was assigned to her, which was never done.

The serious and important question in the case is whether the widow of George McKaig, who died seized, was entitled to the exclusive possession and use of the premises in question under the second section of the Dower act (*Rev. 1876 p. 320*), which enacts that "until such dower be assigned to her it shall be lawful for the widow to remain in and hold and enjoy the mansion of her husband and the messuage or plantation thereto belonging, without being liable to pay any rent for the same."

The facts are as follows: The widow, Sarah McKaig, owned in her own right a farm, upon which was a dwelling and the ordinary outbuildings, and in and upon which she resided with her husband for many years before and at the time of his death. This was their only home and mansion. Immediately adjoining this farm of the wife—the dividing line running near the buildings—were situate the lands in question belonging to the hus-

McKaig *v.* McKaig.

band. They comprised plow, meadow and wood land, the proportion of plow land being small, and contained one hundred and forty-eight acres in three parcels of ninety-eight, thirty-three and seventeen acres respectively, of which, however, only the larger one adjoined the wife's farm. The husband worked and used these lands in common with his wife's lands, making no distinction. There was no dwelling or other buildings upon them.

The question is, was the widow entitled to quarantine in them? I can find no judicial expression or decision on the point. The industry of counsel was unable to cite any. Nevertheless, I think the question reasonably free from doubt. There is here no " mansion house of the husband," and without it I am unable to perceive how there can be any statutory quarantine. It is " the messuage or plantation belonging *thereto;* " that is, to the mansion house of the husband, of which the widow is given the exclusive right until her dower is assigned. The statute does not give her such right in the messuage and plantation of her husband belonging to and used with her own mansion. The words " belonging to," as here used, clearly indicate uniformity of title as well as contiguity of location and community of use. The right given by this enactment is greater than that enjoyed at the common law. It is not a declaration of what the law was, but a decided change in it. And while our courts have manifested a disposition to construe this section favorably towards the widow, I can find in such disposition no warrant for changing what seems to me to be the plain meaning of the language used. I think the widow was not entitled to the exclusive use of these lands, and hence that the son who was in possession must account for two-thirds of the rents and profits.

With regard to the amount of the rents and profits, the proof shows that the defendant Charles moved into the mansion house with his mother immediately after his father's death. His mother was far advanced in years and infirm, and was, besides, at the time quite ill from some temporary disorder, from which, however, she so far recovered as to live eight or nine years. The complainant and his brothers and sisters, other than

McKaig v. McKaig.

Charles, understood and supposed, and there was evidence tending to show, that Charles entered under an agreement and understanding that he was to pay rent at the rate of $150 per year for the whole farm, including both the part belonging to his mother and that belonging to his father, and that the same should be applied to the support of his mother during her life. In other words, that he was to support his mother. for the use of both farms, and his brothers and sisters supposed that this was the arrangement until after their mother's death, when, to their surprise, Charles made a claim against her estate for a large sum, $1,314, for her support and maintenance from her husband's death, and this claim, after litigation in the orphans court, was sustained and Charles received payment therefor without any allowance for the use of either farm. This result could only have been arrived at on the ground that the arrangement and understanding upon which the other heirs supposed that Charles was occupying these premises had no legal existence, and the heirs are, therefore, free to demand an account of the rents and profits in this suit.

Much evidence was given as to the annual value of the land here involved. It will be profitless to discuss it. The amount involved is trifling, and I will simply state the result at which I have arrived. I find the value of the use of the land here in question to be $36 a year over and above taxes, and the defendant must account for two-thirds of that sum, or $24 a year for nine years, making $216. The wood cut by him I find to be worth $25. He should pay interest on these sums from April 1st, 1888. The defendant did not set up the statute of limitations.

I think the defendants, other than the complainant, though they have not answered or filed cross-bills, are entitled to the benefit of this adjudication, although, strictly speaking, made only upon complainant's prayer. The practice in partition cases does not require that each party should assert his rights by a separate pleading. To require them to do so would greatly increase the cost of the proceedings.